on behalf of the Avalanche, Mr. Stephen Rehfeldt, and we have the attorney, Mr. David Preston. Thank you, Mr. Rehfeldt. You may proceed. Good morning, Your Honors. May it please the Court, I'm here today on behalf of the appellant, Hollywood Casino-Aurora. As the Court is aware, we are appealing the trial court's dismissal of the complaint which we filed on behalf of Hollywood against the defendant, Aurora Metropolitan Exposition Authority. In our complaint, we allege that Hollywood had paid the authority roughly $700,000 more than the authority was entitled to receive under the terms of a lease for a parking garage that was owned by the authority and leased by the authority to our client, Hollywood, under the terms of a long-term lease. Hollywood had built the parking garage itself on land owned by the authority. The total cost for the entire project was about $14 million. Of that amount, Hollywood put in at the outset about $3.5 million in cash. The rest of the money was raised through the issuance of revenue bonds. There was $11.5 million received as the result of the issuance of bonds. Of that amount, $10.5 million was actually used for the construction. The remaining $1 million was split up between $300,000 was spent on costs associated with issuance of the bonds, legal fees, etc. Can you please explain how your complaint made on a case for unjust enrichment? The elements of a cause of action of unjust enrichment, in order to state a cause of action for unjust enrichment, the complaint had to allege that the defendant had unjustly retained a benefit to the plaintiff's detriment and that the defendant's retention of the benefit violated a fundamental principle of justice, equity, and good conscience. The allegations in our complaint that stated a cause of action for unjust enrichment were set out on pages 12 and 13 of our brief. In particular, in paragraph 27, we allege that Hollywood had made a written demand on the authority for a refund of the alleged overpayment. In paragraph 28, we allege that the authority had refused to refund the money and that it had been unjustly enriched as a result of its retention of that money. And in paragraph 29, the complaint alleged that it would be unjust and inequitable for the authority to retain the overpayment. That's not the only three paragraphs that we cited in the brief, but I believe those three contain the kernel of the elements of the cause of action of unjust enrichment. Were you prejudiced by the combined 615, 619 motions? We were in this sense, and that is that once the trial court ruled, once the trial court granted the 2619 part of the motion and ruled that our complaint was time barred under Section 8101A of the Tort Immunity Act, we were pretty well stuck, notwithstanding the fact that the court gave us leave to amend. What were you going to do, change the dates? Yes, exactly. So we had to have this court address that issue before we could really do anything further in the trial court. We had said what our claim for restitution was in the complaint, and what the trial court said was that complaint doesn't state a cause of action for restitution. We didn't have other facts to allege. Those were the facts, and if our complaint's time barred, if I went and amended the complaints, it's still going to be time barred. So to that extent, yes. It's somewhat like that, I think, in the DeWitt case that I cited in our brief, where the plaintiff was facing a combined 2615-2619 motion. The 2615 motion was based on the grounds that the complaint failed to state a cause of action, I think, for breach of contract in that case. The 2619 motion, I don't recall the grounds. I think it was statute of limitations there. And the trial court granted the 2619 motion. On appeal, the appellate court held that the trial court shouldn't have granted the 2619 motion, that the complaint wasn't time barred. The appellee in that case requested the appellate court to nevertheless affirm the dismissal of the complaint on the alternative grounds, the grounds that the complaint failed to state a cause of action for breach of contract. And the appellate court acknowledged that the elements of the claim for breach of contract weren't in that complaint, but it declined to affirm on that basis. What the appellate court said in that case was that it was the policy not to dismiss cases where it looked like a plaintiff could state a cause of action, and the trial court in that case had indicated that it was willing to give the plaintiff an opportunity to file an amended complaint to fix the... But a 619 presumes that it stated a cause of action, so why would you have to have changed it? Well, the 2619 presumes it states a cause of action. He granted a 619, which meant that he essentially, for purposes of a 619, decided that it stated a cause of action. Well, it has occurred to me that if there's a combined motion filed in a 2615 and 2619, and the court finds that the complaint fails to state a cause of action, that it shouldn't proceed on to the 2619 part of the motion because that is what you mentioned is correct. The 2619 motion assumes that the complaint has stated a valid cause of action, and if the elements of a valid cause of action aren't in the complaint, I don't see how you can grant the 2619 part of a combined motion like that. I never had this problem. I never allowed a combined motion to be filed. I told the movement, take your choice, pick one or the other, but I'm not going to handle both at the same time. But now 2619.1 says you can bring a combined motion. Well, our opinions in the past have said that even if that 619.1 motion is filed, the 615 motion should be handled first and then given leave to amend should that be granted before you can get to the 619.1. Did the agreement spell out that the casino was on the hook for $11.5 million? Was it that explicit, the amount of money? The agreement spelled out that the casino was obligated to repay the bonds, and the lease said that the bonds were to be repaid by the means of what the lease characterized as supplemental rent payments. What I'm asking is the amount of money was never specified in the agreement? I can't say that for sure. Not in the lease, no. I don't think the entire construction costs were known at the time that the agreement was entered into, what the final construction costs were going to be. The agreement did require the casino to pay for everything over and above what was financed by the bonds, but what that everything over and above was going to be I don't think was known. And to pay the bonds back. Yes, that's right. What I'm getting at is if the $700,000 was set aside explicitly to pay the bonds back, which is what it was in the service fund, then really the casino, as far as the bonds are concerned, was on the hook for $10.8 million. That's exactly our point, yes. That is exactly our argument. That under the terms of the agreement, we were to pay enough supplemental rent so that the bonds got paid in full without any money coming out of the pocket of the authority. That we paid everything. But what wound up happening is we didn't just pay everything. We paid everything and paid another $700,000 or so that went straight into the pocket of the authority to go to pay the bonds. That $700,000 is nothing but pure profit and a pure windfall, which we've alleged, for the authority. They made $700,000 when the agreement never contemplated them to make anything. They weren't supposed to spend anything. We were taking care of the whole deal. We were picking up every dime. But those agreements never contemplated that we were supposed to pay the authority $700,000. But they wound up with $700,000 of our money. And that lease agreement never addressed the $700,000, right? No. Specifically. The trust agreement addressed it in the sense that it required that that would be returned to the authority, correct? Right. Under the terms of it, there were actually two trust agreements, but they were both pretty much the same on this point. That money, that $700,000, was put into what those agreements called the Debt Service Reserve Fund. And they were to be used to pay the bonds if there was no other money in the trust to pay them. What material issues of fact would remain if, in fact, we remained to this fact and found that you had stated a cause of action? Well, I don't know if I know the answer to that question. We haven't done any discovery at all. We got thrown out instantly. In fact, I know I don't know the answer to that question. Well, that doesn't mean there isn't an answer. No. Let me ask you a question about when the trust was redone with Bank of New York in 2003, there was some provision added about excess funds existing after the January 1 payment. Do you recall that? You're talking about the second version of the trust? The second version of the trust, 2003. And I know that that version said any money left over would go to the authority. I understand that. But was there another provision in there that talked about after the January 1 payout, which would have been January 1 of 2004, any excess funds would have been distributed to the authority? January 1, 2004 or 2002? I may be misreading that. I just want to know if you recall. Well, the last payment made on the bonds was made in, I think it was the January 2010 payment. I don't recall the clause you're referring to in particular about January 2004. That second trust was entered into in 2003.  By January 2004, those bonds would have been nowhere near paid off. No, but I thought it discussed the January 1 bond payment. The payments were due, I think it was the new trust had it two times a year, if I'm not mistaken, and the old trust had it four times a year. Yeah, it was a different payment schedule. Yeah, I'm talking about the payment schedule. That one particular payment you're talking about? I don't recall the clause. I don't know why that one would have been treated differently than others, and I don't know that it, in fact, was. Justice McClernand, back to your question about what facts might yet to be in dispute. I suppose the construction of some of the language in those documents would, I believe some of that language in there is ambiguous, and those would be factual issues. If the documents are determined to be ambiguous, they would be decided as a question of fact rather than a question of law. One of the provisions in particular I'm thinking about is the provision in that second trust agreement that said when the payment of the debt, whatever is left in the debt service reserve fund was to be made under the terms of that agreement from the trustee to the authority, it was to be made, it was to be given to the authority and to be applied by the authority according to the terms of the lease. So the question is what was meant, the question I have is what was meant by the terms to be applied according to the terms of the lease, because when you look at the lease, there's nothing in there about the bond, about the debt service reserve fund. So what was the meaning of that language? I don't know. I don't know how it got in there, who put it in, why it was there. It appears to me that someone either thought there already was language in the lease covering that issue or someone was contemplating an amendment to the lease that would correspond to the revised version of the trust agreement, but that's absolute speculation. I don't know any of that. I just don't know anything about the history of that language, but it's odd language in light of the fact that there is nothing in the lease talking about that issue, but the trust agreement has language in it that clearly contemplates that the lease does say something on that issue. The 2619 part of the court's ruling was just plain wrong. We asked for the remedy of restitution, and if you're asking for a remedy in your complaint that is something other than damages, Section 8101A of the Tort Immunity Act simply does not apply to that complaint. That section applies only to complaints filed where the remedy is sought as damages. We weren't seeking that. We were just seeking a refund of our money. Thank you. Thank you, counsel. You will have time for rebuttal. Mr. Bressley, you may proceed. Thank you. You're welcome. May it please the court and counsel. Your Honor, one of the fundamental misrepresentations that has been made in this case is that more than what was borrowed had to be paid back, and let me explain. The bonds were $11.5 million. What the casino paid in supplemental rent was $11.5 million plus interest, not a penny more. Mr. Rehfeldt's argument would have the court believe that they paid $11.5 plus $700 and some thousand dollars, which is absolutely untrue. Part of the bonds, $700,000, was to be set aside into the debt relief, debt service reserve fund. Yes. For the sole purpose of paying back the bonds should monies not be otherwise available to pay back the bonds when they come due. And if that fund was relied upon, the authority then had the right to pursue the casino to replenish that fund. And that existed until the bonds were paid off, not until the point that the amount in the debt reserve fund was sufficient to repay the balance of the bonds, until the bonds were paid off. So what happened here is the obligation to pay the supplemental rent continued until the bonds were paid in full. And at that point, under the trust indenture, the money was paid back to the authority. One of your honors asked, well, where's the language in the lease which talks about the disposition of money that's paid back? Very simply, under the redevelopment lease, Section 11.5, disposition of amounts collected may be applied by the authority in the manner as decided by the authority without prior notice or consent. It's covered in there. If you look at the trust indenture, the debt service fund is only to be used when monies are not otherwise available, but that does not relieve their obligation to make the payments of the supplemental rent. Mr. Gressler? Yes, sir. You stepped up before us and you commenced with there seems to be a serious disagreement as to this one aspect of the case. How can you reconcile that statement with the idea that on a 619 motion, it's presumed that the complaints stated a cause of action, which meant that what you just related to us might have some basis for a motion seeking summary judgment, but what relevance or materiality does it have relative to a 619 where you are supposed to be admitting the cause of action has been stated? It's a contorted course, so stay with me. The 615 motion was that the plaintiff's complaint had not stated an unjust enrichment claim for restitution. You must state an unjust enrichment claim for restitution to get out of 8-101 of the Tort Immunity Act, which holds one to a one-year statute of limitations. Having held that the complaint was not one for unjust enrichment for restitution, that one-year statute of limitation would apply, and therefore the court said this must not fall under one of the exceptions to the Tort Immunity Act, therefore it is barred, which is only raised by a 619 motion, of course. I understand what you're saying, and if you look at the rank tree analysis, they actually went through that kind of bifurcated analysis, too. What you're saying is it all comes down to the complaint, whether the complaint stated a cause of action for unjust enrichment. If it does, you lose on both, and if it doesn't, you win on both. Exactly. Okay. Exactly. That's exactly right, Your Honor. The timeline could be that it was, in fact, what it prayed for, which was restitution. If it doesn't state a cause of action in restitution, it doesn't cause it to transmogrify into some other type of cause of action, which would be called damages. I mean, you know, it's a little bit like saying if that cat isn't a dog, it must be a snake. Well, except for the way that 8101 reads, it accepts contracts and other claims. It's kind of open-ended. And so you have to say, well, what are the other claims? Well, the other claims that the courts have recognized are unjust enrichment claims for restitution, contract, and that's why, you know, when we were in the trial court, counsel asked for leave to amend, presumably to file a breach of contract claim, which, of course, couldn't be brought under the exhibits which are part of the document. So they're kind of stuck betwixt and between. If they could bring a breach of contract claim, that would not be time-barred. But that's the next question that we never get to. So if I understand your logic, they didn't state a cause of action for unjust enrichment, so therefore the only other alternatives were they didn't state a cause of action seeking damages or they did state a cause of action seeking damages, in which case the Tort Immunity Act would apply. Correct. Correct. I said it's a twisted course. You point us to Section 11.5 of the lease, and it seems to me like we're arguing at least a summary judgment motion here and almost like we're past trial, so we have to keep our eye on the ball. We never got the discovery in this case because the 615 motion was granted, that this complaint on its face did not state a cause of action for unjust enrichment. You're asking us to look at leases and other things. We're not supposed to look at that. We're supposed to read this complaint that I have in front of me and say, taking all of these allegations as true, does it state a cause of action for unjust enrichment? Your Honor, I disagree with you because under 2-606 of the Code of Civil Procedure, exhibits to the complaint are considered part of the pleading, and all of that is in there. So you do get to look at it, and the trial court did get to look at it. And the language in the exhibits couldn't be clearer. But really, that really gets to the argument, which I haven't touched on yet, which is this is all covered by the contract. The contracts, the lease, the redevelopment agreement say they're going to pay the rent. Here's what they're going to pay. Here's the conditions under which they're going to pay it. And that's exactly what happened here. Based upon, if I were to ask you the same question I asked Mr. Rayfeld, which is if this were remanded, what material issues of fact do you think might exist? Your response would be there are none because you just told us that as far as you're concerned, based upon the attached exhibits, you're entitled to judgment as a matter of law. I would agree with you, Your Honor, with this caveat, and that is it may very well be that the court identifies some issue that I have not thought of. But subject to that, I think I agree with you. Well, you said the opposite of what Mr. Rayfeld said, which was you think everything is very clear, and you think there's at least something very ambiguous, which means that at least there are some things that you disagree on relative to the nature and extent of this transparency. Would that be correct to say? We disagree, certainly, but I think if you look at the documents, what's apparent is, and why this can't state a claim for unjust enrichment for restitution is, this was not the casino's money. It was money that was borrowed. It was not that the casino posted a $700,000 fund to be used as a debt service reserve. Instead, it was the proceeds of the borrowing. And nothing in the loan documents, nothing in the bond documents, nothing anywhere gives the casino the right to that money. What if it did? But it doesn't, Your Honor. Let me ask you a question, because you said something earlier. You said that if, in fact, that $700,000 that was originally borrowed was paid out because the monies weren't otherwise available, then the casino would have to replenish that money. That's correct. So if the casino then replenished that money, and that money was still sitting there at the end of this, they'd get that money back. No, Your Honor, because the only reason that they would have to replenish the money is because they hadn't made the rent payment they were required to pay in the first place. That's the only way that we can go after them. In other words, rely on the debt service reserve fund because they didn't make a rent payment. And then we go after them and say, hey, guys, you didn't make a rent payment. And once we get that rent payment under the trust indenture, we're obligated to replenish the debt service reserve fund. Well, the bonds were coming due at different rates, were they not, different times? Yes. So, I mean, the supplemental rent was a steady flow of income, was it not? Yes. And then if there's a bigger bond payout at a certain time, perhaps that money wouldn't have been available. The way that it was amortized, the payments were steady. The payments were steady. Yes. I think it's attached to one of the exhibits. The last two payments are $148,000. The other two were like $300,000-some-thousand per payment. So there was no way under this agreement that this money would have been paid out from that fund other than if they didn't make their supplemental rent payments. Correct. That's correct. We get all that from the complaint and the documents. Yes. And that's a 615 motion. Yes. Where does this, if the plaintiff didn't pay this money in, where did this money come from? The debt reserve fund, which was the proceeds of the borrowing. In other words, $11.5 million gets borrowed. The proceeds of the borrowing, and they were supposed to pay back the proceeds of the borrowing. Yes. That's in the loan. Well, then why, if you supposedly have a surplus of $709,000, why should they have had to pay in $709,000 if supposedly it was supposed to be a surplus? Your Honor, it's not a surplus. It's the expense of the bond issuance. When the bonds were issued, they anticipated that $11.5 would be borrowed, $10.5 would go to the construction costs, $300,000 would go to attorneys' fees, $700,000 would be deposited into this debt service reserve fund. Those were the application of the proceeds. Then the authority had the obligation to pay all that back. How were they to pay that back? Through revenue. These are revenue bonds. The revenue is the payments that they're made. In other words, what's the difference between that and maybe they say, you know what, we don't like the fact that you're not giving us the number of parking spaces. We're going to deduct that from our lease. I mean, at the end of the day, we're going to be left with a parking structure that they paid for. How is that any different? Because you also have $700,000 that you didn't have before. No, Your Honor, we had to repay that. That's not true. We had to repay that, Your Honor. To whom? To the bonds. We had to pay that to the bond issuer. Repaid it with the payments from the agency. Which is exactly what was contemplated under the lease and under the agreements, yes. That's what revenue bonds do. But at the end of the day, you still had $700,000 excess. It was not excess, Your Honor. It was money that was paid from principal to us to issue. It was paid and distributed into the fund to issue the bonds. I'm talking about when this was all over. Was there $700,000 left over or not? There was $700,000 in the debt service reserve fund that was distributed to the casino, yes, Your Honor. That's exactly what the agreements contemplated. To the authority. Not to the casino. I'm sorry, to the authority, yes. But that's exactly what the agreements contemplated. What I'm getting at is you just said, at the end of the day, they paid for the structure, we got a structure. At the end of the day, they paid for the structure, you got a structure, and you got $700,000. Exactly what the parties agreed would happen. And that really is the first argument that I was going to make, which is all of this is covered by the contracts. And since all of it is covered by the contracts, what they're really asking you to do is say, you know what, we forgot to negotiate this term. We saw, because anybody could see what would happen, what's going to happen in the end, but we forgot to negotiate that we get that money back. But this is all covered by the contract. What happened in there is exactly what the contracts contemplated. And when there is a contract which covers the relationship of the parties, you can't bring an unjust enrichment claim. This is different from those cases which the plaintiff cites where the unjust enrichment claim was allowed because the claim was outside of the scope of the contract. They performed services outside the scope of the contract. That's not this. This is all within the scope of the contract. And that's, I think, the primary basis why Judge Mueller granted the motion to dismiss that they couldn't bring this unjust enrichment claim. It's barred by the existence of the contract. Other than Section 11.5, which says that the amounts collected may be applied by the authority, which is a more general clause, there's nothing else that specifically addresses it in the contract between the authority and the casino, correct? Not in that way, but again, you can get there because the payment of supplemental rent says here's what you're going to pay every month and here's the terms under which you're going to pay it. With no right of refund, with no deposit, with no contemplation that they would ever get any money back. The only place it's specifically addressed, though, is the trust agreement, correct? The trust agreement, yes. You're right. Both of the trust agreements. Yes. Which they're not a party to. But they have a right to review and approve. But they're not a party to them, so it's not a contract between you and them. It is not a contract. They have the right to review and approve it, Your Honor. And that's, I mean, they, believe me, the trust agreement would not have been entered into had they not approved it. That was part and parcel of this deal. You're right, the trust agreement's not them because the trust agreement is between the borrower and the trust issuer. They would never be a party to them. Have you ever seen a case where an unjust enrichment claim was barred because there was a contract between two other parties and this other party had the right to look at it? But, Your Honor, I'm not just relying on that contract. I'm relying on primarily the redevelopment agreement and the lease and all of the other documents. You know, the interesting part, Your Honor, is in their complaint, they rely on the trust agreement to establish their rights. Supplemental rent was to be paid under the lease agreement until the bonds were repaid in full. Correct. Okay. Thank you, Your Honor. Thank you. Thank you. Okay. Mr. Rehfeldt, rebuttal argument. Might as well start off with why does 11.5 not apply, or does it apply? Section 11.5, I don't think it has anything to do with the issue we're talking about. And there's nothing in any of those documents that talks about or contemplates what happens if there's an overpayment of supplemental rent under the lease. Nothing. Nothing in the trust agreement, nothing in the lease, nothing in the redevelopment agreement. It's not talked about anywhere. That 11.5 doesn't talk about it. You keep calling this, though, an overpayment, but it really is just payment of the full amount of the bonds, right? No, it's not. Well, we forgot about how to dispose of these funds. Let me posit the flip side of the coin for a minute. This isn't what happened, but let me posit this. Let's say the casino stopped paying supplemental rent when the principal of those bonds got down to $709,000. Under the terms of the trust agreement, the last $709,000 would then have been used to pay off the bonds. What would have been the result then? Number one, bonds would have been paid in full, 100 cents on the dollar. Number two, the authority would have paid not $1 towards the payment of the bonds. In order for the authority's position to be correct, under that circumstance, the authority would have to be able to sue and have a valid claim against the casino for $709,000. They don't. That wasn't the deal. The deal was we pay the bonds. What was the formula for coming up with $709,000? Don't know. I don't know. The formula could have been $10 million, couldn't it? Yeah, what if the reserve fund was $5 million? Does that mean they get $5 million at the end? $5 million? That's what the argument is against us. Did the contract call for you to replenish the fund if it was used? The trust agreement, you mean? No. No. Yeah, it would be the trust agreement. Yeah, and we weren't a party to it. It might have called for a, I don't know if it called for a replenishment, but it wouldn't have been a direct call on us for replenishment because we weren't a party to the agreement. The supplemental rent payments that we were making were geared to the amount that was supposed to come out under that trust agreement. And there was an obligation in the ordinance that authorized the issuance of the bonds that required the authority to take our supplemental rent and put it inside that trust agreement, I think within 48 hours or 72 hours after they got it. So they weren't supposed to hold it, they were supposed to put it in there. Can you comment on counsel's argument that you had the right to review and approve or disapprove the trust agreements? I don't know whether that actually happened. There was language in their office. Did you mention that in your complaint? That we reviewed it? That you had the right to review and approve? Did you allege that in your complaint? I don't believe I did, no. Is it contained in any of the documents that are attached to your complaint? I don't recall seeing that. There is some language in one of the documents that said we had a right to review the cost of the project. I can't speak to the issue of whether there was language in there saying we had a right to review the trust agreement. Doesn't mean we didn't, but I don't recall that. I'd like to go back to the 2619 motion for a minute. And the issue of whether the fact that we did or did not state a cause of action for a trust enrichment has any effect on that. It doesn't. 8101 applies only to complaints where the remedy sought is damages. It doesn't matter whether the complaint states a cause of action or doesn't state a cause of action. If the remedy requested is something other than damages, that section just has no application, period. And the remedy we were requesting, whether our complaint stated a valid cause of action for adjustment enrichment or not, was clearly the remedy of restitution. There's no doubt about that. It's a textbook example of a restitution remedy. It matches exactly the definition of restitution that the Supreme Court put out in that rangery case. Because we were not requesting damages, 8101 is just not applicable, period. Is that my? Is that my? It hasn't gone off yet. Counsel mentioned that we were arguing that we had paid more than $11.5 million when we should have only paid $11.5. That's not what we were arguing. We're arguing that it didn't take $11.5 million to pay back the bonds. It only took $10.8 million. The other $700,000 was never disbursed. It was sitting there already available to pay the bonds. All we had to come up with was the other $10.8. We came up with $11.5 instead of $10.8, and that's where the $700,000 overpayment came from. Thank you. I'd like to thank the attorneys for their arguments. The case will be taken under advisement. We'll take a short recess.